# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:06CV264-H

| | |
|---|---|
| **GLORIA WOODARD,**<br><br>**Plaintiff,**<br><br>v.<br><br>**NORTH CAROLINA DEPARTMENT OF TRANSPORTATION, and JOHN ROBINSON, JR.,**<br><br>**Defendants.** | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the "Defendants' Motion for Summary Judgment" and "Memorandum of Law in Support . . ." (document ##13-14), both filed May 25, 2007. The Plaintiff filed her "Memorandum in Opposition . . ." (document #19) July 13, 2007. The Defendants did not file a reply memorandum and the time for doing so has expired. The Defendants did, however, file a "Motion to Strike Paragraphs 15 and 16 of Plaintiff's Affidavit" (document #20) July 20, 2007. The Plaintiff filed her ". . . Response to Defendants' Motion to Strike . . ." (document #21) September 4, 2007. On September 6, 2007, instead of a reply memorandum, the Defendants filed a ". . . Motion to Strike Plaintiff's Response" (document #23).

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> both of the Defendants' Motions to Strike, but <u>grant</u> their Motion for Summary Judgment, as discussed below.

# I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action seeking relief for race and retaliation-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII"), 42 U.S.C. § 1983, and the North Carolina and United States Constitutions.

The Plaintiff is an African-American woman residing in Albemarle, North Carolina. She was initially hired by Defendant North Carolina Department of Transportation ("NCDOT") in 1986, and was promoted to Assistant Supervisor in Charge of the Auto Theft Division in 1992. Throughout the Plaintiff's employment she performed at satisfactory levels, although it was widely perceived that she had difficulty maintaining cordial relationships with fellow employees (subordinates and supervisors) and that she was periodically rude to members of the general public.

The NCDOT has the following specific policies requiring courteous behavior:

> Members shall at all times be courteous, patient and respectful in dealing with the public.
>
> . . .
>
> Members shall treat other Members of the Bureau with respect due them as fellow workers. They shall be courteous, civil and respectful of their superiors whether on or off duty. When addressing or referring to a ranking officer, their rank and name shall be used.
>
> . . .
>
> Members shall cooperate with, support and assist each other in all ethical endeavors in every opportunity and shall not publicly criticize the work or the manner of performance of duty of any other Member.

Stemming from these policies, on November 18, 2004, the Plaintiff received a written warning for "unacceptable personal conduct" from Defendant John Robinson, Jr., also an African-American and the Director of the License and Theft Bureau.[1] This incident involved the Plaintiff

---

[1] The Plaintiff apparently filed an administrative proceeding to challenge this discipline which was abandoned when she filed the instant action.

telling her immediate supervisor, Benny Drye, that one of her subordinates had a head "so big it would not fit through the door." She also stated that both Mr. Drye and her subordinate thought they were better than other employees of the NCDOT.

In a similar incident, on March 17, 2006, the Plaintiff's behavior toward a former subordinate, Paula Norman, was viewed as "embarrassing and intimidating." After telling another employee to watch her say hello to Ms. Norman, she said hello to her and asked her how she was doing. Ms. Norman responded, and the Plaintiff leaned over to put her ear in front of Ms. Norman's mouth and told her she could not hear her. While this isolated incident does not appear "embarrassing and intimidating," it is the history of the Plaintiff's disrespectful and intimidating behavior toward Ms. Norman in 2004, when the Plaintiff supervised her, which quite reasonably caused this incident to be perceived as negatively as it was.[2] The Plaintiff argues, with no supporting evidence, that similarly situated white employees were not reprimanded for comments similar to those she made to Mr. Drye and Ms. Norman.

Shortly after the incident with Ms. Norman, it became known that the Plaintiff had violated another of the NCDOT's policies. Specifically, the Plaintiff's job and NCDOT policies required her to conduct on-site audits of automobile dealerships. The audits require the NCDOT employee to examine the premises of the dealership, including posted signs, licenses, and sales representative lists, which could only be observed by physically visiting the dealership. On March 30, 2006, the Plaintiff admitted to her District Supervisor, Mr. Purnell Sowell, also an African-American, that she had been conducting dealer audits from the Charlotte District Office rather than actually visiting the

---

[2] For example, in early 2004, when the Plaintiff was introduced in a meeting as Ms. Norman's and several other employees' new supervisor, the Plaintiff announced that she knew Ms. Norman was going to get on her "last nerve." She also belittled her work and did not allow Ms. Norman the same opportunities as fellow employees.

3

premises of the dealerships as required. The Plaintiff completed fifteen audits in this unauthorized manner – and on each occasion submitted official reports containing false information.

The Plaintiff does not deny that she completed off-site audits, but argues that similarly situated white employees have completed audits in the same manner and have not been terminated. In support of this argument, the Plaintiff cites the deposition of her former supervisor, Benny Drye. However, Mr. Drye's testimony tends to prove the opposite conclusion. For example, he states:

> In dealership audit when you go out to the location sometimes you cannot get up with the owner at that location. I know of situations where even myself have gone out to a dealership, looked at their cars, looked at their sign, their office space, make an attempt to contact the owner and could not and finally make a contact with that owner at a later time and have him bring his salesman license and various documentation with him by the office after making contact. A lot of times you would have to write those up because you couldn't get up with them and you'd have to put them out of business but that's the only time you would do in the office type documentation with a dealer, only after you've been out to his location, got some serial numbers off some cars and compared his title work to them and so forth. It can get real in-depth.
>
> . . .
>
> As to dealer – an inspector's required to go out to the field and do the dealer audit at the dealer location. You have a lot of circumstances that can bring a dealer in but it doesn't do away with the requirement that you have to go out to the location and physically see and verify that the sign is up, the business is actually in business and he has stock out there, et cetera.
>
> . . .
>
> I haven't completed an audit by telephone, no, you couldn't see anything over the phone.

In fact, Mr. Drye's only testimony which remotely supports the Plaintiff's allegations is that he once had to perform several dealership inspections in Richmond and Moore counties because the inspectors responsible for those dealerships had been doing a "very poor, poor job." This testimony, when considered in context with all of Mr. Drye's testimony, tends to support the seriousness of an inspection performed without a physical visit to the dealership.

4

In contrast, Defendant Robinson has provided sworn testimony that two white males "were investigated for conducting automobile dealer audits without entering the premises of the dealerships," and both chose to resign while being investigated for this charge. In addition, Robinson testified that another white male employee was terminated in November 2005 for being "untruthful."

As a result of the incident with Ms. Norman and her admission that she was conducting dealer audits without the required on-site visit, the Plaintiff's employment was terminated on April 18, 2006.

The Plaintiff filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), to which the EEOC issued a "Right-To-Sue" letter. On May 19, 2006, the Plaintiff filed her Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging claims for race-based discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1983, and the North Carolina and United States Constitutions.

On June 26, 2006, the Defendants removed the state court action to federal court. Removal has not been challenged and appears proper.

On May 25, 2007, the Defendants filed their Motion for Summary Judgment, which has been fully briefed as set forth above and is, therefore, ripe for determination.

On July 20, 2007, the Defendants filed their "Motion to Strike Paragraphs 15 and 16 of Plaintiff's Affidavit." Although, as discussed below, none of this evidence is sufficient to create an issue of material fact, the undersigned has considered all of the Plaintiff's evidence and, accordingly, the Defendants' Motion to Strike will be <u>denied</u>.

In addition, on September 6, 2007, the Defendants filed a Motion to Strike the Plaintiff's

Response to the above mentioned Motion to Strike – due to the untimeliness of the Response. While the undersigned is certainly aware of the untimeliness of the Response, in the interest of full consideration of all of the Plaintiff's arguments and proffered evidence, the Defendants' second Motion to Strike will also be denied.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S. E. 2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); and Phillips v. J.P. Stevens & Co., Inc., 827 F. Supp. 349, 353 (M.D.N.C. 1993) ( "The public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII").

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII claims to determine the Plaintiff's state public policy claims.

### B. Title VII Claims Against Defendant John Robinson, Jr.

It is clear that the Plaintiff's Title VII claims cannot stand against the individual defendant, John Robinson, Jr. The Fourth Circuit Court of Appeals has unequivocally held that employees, even supervisors, are not liable in their individual capacities under Title VII. Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 180 (4th Cir. 1998) ("An analysis of Title VII's language and its remedial scheme leads us to join the other circuit courts and conclude that supervisors are not liable in their individual capacities for Title VII violations"). Accord Wathen v. General Elec. Co., 115 F.3d 400, 406 (6th Cir. 1997); Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996); Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996); Williams v. Banning, 72 F.3d 552, 554 (7th Cir. 1995); Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995); Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995); Smith v. Lomax, 45 F.3d 402, 403 n.4 (11th Cir. 1995); Grant v. Lone Star Co., 21 F.3d 649, 653 (5th Cir. 1994); Smith v. St. Bernards Regional Medical Ctr., 19 F.3d 1254, 1255 (8th Cir. 1994); and Miller v. Maxwell's Int'l. Inc., 991 F.2d 583, 588 (9th Cir. 1993).

7

The Fourth Court has stated that:

Title VII exempts small employers; it would be incongruous to hold that Title VII does not apply to the owner of a five-person company but applies with full force to a person who supervises an identical number of employees in a larger company.

Lissau, 159 F.3d at 181. Accord Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir. 1994) (rejecting individual liability under the ADEA).

Accordingly, because the individual Defendant is not a properly named defendant as a matter of law, the Plaintiff's Title VII claims against him clearly must be dismissed.

### C. Race-Based Discrimination

Title VII makes it an unlawful employment practice for an employer:

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

In order to prove a Title VII wrongful termination claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996), citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988).

To overcome a summary judgment motion based upon direct or indirect evidence of discrimination, the plaintiff "must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Brinkley v. Harbour Recreation Club, 180 F. 3d 598, 607 (4th Cir. 1999), quoting Goldberg, 836 F.2d at 848. Accord Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995) (to overcome summary judgment, plaintiff must provide "evidence of conduct or statements that both reflect directly the alleged

discriminatory attitude and that bear directly on the contested employment decision"). In this case, the Plaintiff has submitted no direct evidence of racial discrimination in the NCDOT's decision to terminate her.

Under the alternative proof scheme established in McDonnell-Douglas, if the employee establishes a prima facie case of illegal discrimination (as discussed below), the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

The Supreme Court has made clear that the plaintiff at all times "bears the ultimate burden of proving . . . intentional discrimination." Runnebaum v. NationsBank of Maryland, 123 F.3d 156, 164 (4th Cir. 1997) (en banc), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993) (holding that prima facie case plus disbelief of employer's asserted justification insufficient to survive summary judgment). However, in Reeves v. Sanderson Plumbing Prods., Inc., the Supreme Court held that:

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability.

530 U.S. 133, 147-48 (2000) (emphasis added). Accord Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000) ("In Reeves the Supreme Court held that when a plaintiff establishes a prima facie employment discrimination case and that his employer's explanation is pretextual, this does not automatically create a jury question, but it may do so").

Finally, it is well settled that the perception of the decision-makers alone, not the plaintiff,

her co-workers or other third parties, is relevant to the question of discrimination. See, e.g., Tinsley v. First Union Nat. Bank, 155 F.3d 435, 444-45 (4th Cir. 1998); Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996); and Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991).

As the Fourth Circuit has stated, in order to establish a prima facie case of discriminatory discharge under Title VII, a plaintiff must show:

> (1) that [she] is a member of a protected class; (2) that [she] suffered from an adverse employment action; (3) that at the time the employer took the adverse employment action [she] was performing at a level that met [her] employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant outside the protected class.[3]

King v. Rumsfeld, 328 F.3d 145, 149 (4th Cir. 2003), citing, Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999).

Applying these principles to this case, even taking the facts in the light most favorable to the Plaintiff, she has failed to establish a prima facie case of wrongful termination based on race. The Plaintiff is African-American, that is, a member of a protected class, who was terminated, and accordingly, she has satisfied the first and second prima facie elements. However, she has not established that her job performance was satisfactory or that her position was filled by a similarly qualified applicant outside the protected class.

Indeed, the Plaintiff admitted to a major problem with her job performance. She was completing dealership audits dishonestly. She has presented no evidence besides her own speculation that other employees completed audits in this manner, and that this somehow excuses her dishonesty. Accord Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir.

---

[3] The Fourth Circuit reiterated this standard in Miles v. Dell, Inc., 429 F.3d 480, 486 (4th Cir. 2005), but recognized that exceptions to the fourth prong of this test exist and should be evaluated in each individual case.

1995) (unsupported speculation insufficient to defeat summary judgment).

In addition, although this factor is not being treated as dispositive, the Plaintiff has not shown that the position was filled by a similarly qualified applicant outside the protected class. In fact, no evidence has been presented by either side as to who filled the vacated position.

Even assuming <u>arguendo</u> that the Plaintiff had established a prima facie case, the NCDOT has provided evidence which shows a significant problem with the Plaintiff's job performance. In other words, it has "articulate[d] some legitimate, non-discriminatory reason for its employment decision." <u>McDonnell-Douglas</u>, 411 U.S. at 802. The burden, therefore, shifts back to the Plaintiff to establish that the NCDOT's stated reasons are "merely pretextual" and to carry her "ultimate burden of proving intentional discrimination." <u>Runnebaum</u>, 123 F.3d at 164, <u>citing</u>, <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 506-11.

For the same reasons that the Plaintiff has failed to establish a prima facie case, she also cannot rebut the proffered non-discriminatory explanation for her termination. To the contrary, the circumstances surrounding the Plaintiff's termination, taken in the light most favorable to the Plaintiff, support the Defendant's contention that it did <u>not</u> discriminate against the Plaintiff.

In short, where the Plaintiff has failed to demonstrate the existence of a prima facie case of unlawful discrimination or to raise a material issue of fact as to whether the Defendant's stated reason for her termination was "pretextual," the Defendant NCDOT's Motion for Summary Judgment must be <u>granted</u> as to the Plaintiff's Title VII claim for wrongful termination based on race.

### D. <u>Retaliation Claim</u>

In addition to prohibiting harassment or discrimination in the workplace on the basis of race,

11

religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[4] To establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). See also Hopkins, 77 F.3d at 754; and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not

---

[4] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence . . . Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F. Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct. 2322 (1998). Accord Mayo v. Kiwest Corp., 898 F. Supp. 335, 337 (E.D.Va. 1995).

The Plaintiff did engage in a "protected activity" prior to her termination, by filing an administrative grievance to the November 18, 2004 written warning. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the Plaintiff's complaint regarding her written warning, the NCDOT took an adverse employment action against her when it terminated her employment. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether she can establish a causal link between her protected activity and the termination.

In this case, the Plaintiff's evidence clearly fails to create a genuine issue of material fact as to this final element. The Plaintiff engaged in dishonest conduct. The same conduct for which

others were investigated and then chose to resign. At least one white male was also terminated for conduct which was deemed untruthful. The Plaintiff's termination is clearly linked to her dishonesty.

Finally, for the same reasons she cannot establish a prima facie case of retaliation, the Plaintiff cannot carry her ultimate burden of showing that the Defendant was actually motivated by an unlawful retaliatory purpose. Accord Holder v. City of Raleigh, 867 F.2d 823, 829 (4th Cir. 1989) (finding that employer's belief that employee was not trustworthy a legitimate, nondiscriminatory reason for failure to promote); Brewer v. Dana Corp., 205 F. Supp. 2d 511, 518-19 (W.D.N.C. 2002) (finding that violation of a work rule is a legitimate, nondiscriminatory reason for discharge); and Grier v. Casey, 643 F. Supp. 298, 309 (W.D.N.C. 1986) (finding that integrity and honesty are legitimate qualifications to demand of an employee).

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will be granted.

### E. Section 1983 Claims

The standard for establishing employment discrimination under Section 1983 is the same as that used under Title VII. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (applying the McDonnell Douglas analysis to Section 1983 race discrimination claim). Accordingly, the Plaintiff's Section 1983 claims must also be dismissed.

### F. North Carolina and United States Constitutional Claims

In addition, because the Plaintiff was dismissed for a legitimate, non-discriminatory reason, her constitutional claims, which are premised on the alleged employment discrimination, must likewise fail.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Defendants' "Motion to Strike . . ." (document #20) is **DENIED**.

2. The "Defendants' Motion to Strike Plaintiff's Response" (document #23) is **DENIED**.

3. The "Defendants' Motion for Summary Judgment" (document #13) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.**

4. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: September 7, 2007

Carl Horn, III
United States Magistrate Judge